IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

|  |  |
|---|---|
| TOWN OF GROVELAND, MASSACHUSETTS,<br><br>*Plaintiff*,<br><br>*v.*<br><br>SAINT-GOBAIN PERFORMANCE<br>    PLASTIC CORPORATION;<br>WASTE MANAGEMENT OF<br>    NEW HAMPSHIRE, INC.;<br>HAVERHILL PAPERBOARD CORP.;<br>THE NEWARK GROUP, INC.; *and*<br>UNION MACHINE COMPANY OF LYNN, INC.,<br><br>*Defendants*. | C.A. No.  1:26-cv-11297<br><br><br>**CERCLA COMPLAINT**<br>**42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, TOWN OF GROVELAND, MASSACHUSETTS (hereinafter "Plaintiff"), and for its Complaint against the Defendants SAINT-GOBAIN PERFORMANCE PLASTIC CORPORATION; WASTE MANAGEMENT OF NEW HAMPSHIRE, INC.; HAVERHILL PARPERBOARD CORP.; THE NEWARK GROUP, INC.; *and* UNION MACHINE COMPANY OF LYNN, INC. (hereinafter, collectively, "Defendants"), avers and states as follows:

## INTRODUCTION

1.    Plaintiff, the Town of Groveland, Massachusetts (the "Town" or "Groveland") owns and operates a public drinking water system supplying approximately 6,326 residential, commercial, and industrial customers in the Town of Groveland, Massachusetts ("Groveland Water Source").

2.      The Groveland Water Source includes three (3) gravel packed groundwater wells that supply fresh drinking water to the Town.

3.      In this civil action, Plaintiff seeks to recover the costs associated with removing synthetic per- and polyfluoroalkyl substances ("PFAS") existing in the Groveland Water Source as a result of Defendants' conduct and releases from Defendants' facilities.

4.      PFAS are man-made chemical compounds used in a variety of industrial and commercial products and applications.  They are part of a class of chemicals called "emerging contaminants" because they have only recently been detected in the environment, until relatively recently were not well regulated, and their significant health risks were only fully understood recently.  Generally, PFAS do not degrade through normal chemical, physical or biological processes.  This resistance made them useful in industrial and commercial applications (products like Teflon and Gortex are examples cited frequently), but these same qualities have raised significant concern due to their persistence in drinking water.

5.      Exposure to PFAS has been demonstrated to lead to significant negative health impacts, including (i) reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; (ii) developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes; (iii) increased risk of cancer, including prostate, kidney, and testicular cancers; (iv) reduced ability of the body's immune system to fight infections, including reduced vaccine response; (v) interference with the body's natural hormones; and (vi) increased cholesterol levels and/or risk of obesity.[1]

---

[1] Environmental Protection Agency, Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas

6.      The Town brings this action to address the presence of PFAS in its ground water wells, and specifically, to recover costs associated with removal of PFAS from water drawn from this source, to abate an ongoing nuisance these chemicals constitute, and for such other relief to ensure the Town's continued compliance with all applicable state and federal laws and regulations concerning its drinking water and providing clean and safe water to its constituents.

7.      The Town further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); abatement of an ongoing nuisance; to recover compensatory and all other damages and relief, including all necessary funds to compensate the Town for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of PFAS in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from public water supplies; and for such other damages and relief the Court may order.

8.      Defendants used materials containing PFAS in their business operations, and used, released, stored, handled, and/or disposed of PFAS and PFAS-containing materials in such a manner that has caused PFAS to migrate into and exist in Plaintiff's drinking water, thereby damaging and injuring Plaintiff.

9.      Defendants as the responsible parties, and not Plaintiff, its ratepayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of PFAS from its drinking water supply.

10.     Upon information and belief, Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiff, as alleged, either

through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).  Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. Plaintiff brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

12.     This Court has personal jurisdiction over Defendants by virtue of each Defendant's regular and systematic contacts with the Commonwealth of Massachusetts, including, among other things, conducting business and/or owning property in Massachusetts, and because they have the requisite minimum contacts with Massachusetts necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.  *See* N.Y. C.P.L.R. § 302.

13.     Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Plaintiff's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

## FACTUAL BACKGROUND

### A.     PFAS and Their Risk to Public Health

4

14.    PFAS are man-made manufactured chemical compounds containing fluorine and carbon.  The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

15.    These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, the pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations.  The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil.  In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing.  PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

16.    PFAS have been used in numerous applications and industries, including: coatings and waterproofing; consumer products like cosmetics, personal care, and cleaning products; adhesives; electronics industry; packaging, paper, and cardboard; plastics, resins, and rubber; recycling and material recovery; semiconductor industry; and textiles, among others.[2]

17.    Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations.  For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million.  Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion.  PFAS are an order of magnitude smaller.  PFAS are measured in nanograms per liter; one nanogram per liter is

---

[2] *See, e.g.,* Linda G. T. Gaines, PhD, PE, *Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature review*, American Journal of Industrial Medicine, April 2022, *available at*: https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362.

approximately one part per *trillion* ("ppt").  To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

18.    PFAS enter the environment, in part, from the emissions of industrial and commercial facilities that use PFAS, through effluent runoff from landfills and transfer stations, and waste disposal.

19.    Due to their strong chemical bond, PFAS can remain in the environment, particularly in water, for many, many years and are therefore referred to colloquially as "forever chemicals" and are resistant to degradation due to light, water, and biological processes.

20.    Because of their unique properties PFAS are mobile and persistent in the environment.  PFAS readily contaminates soils and leach from soils into surface and groundwater, where they can travel significant distances.  PFAS therefore spread easily once released into the environment.

21.    Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

22.    PFAS bioaccumulate, meaning that they tend to accumulate in organisms.  PFAS bioaccumulate in numerous ways.  They are relatively stable once ingested, and bind to proteins and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals.  These properties allow them to stay in the human body for long periods of time, and long-term exposure such as drinking PFAS contaminated water every day can cause significant accumulation even at low levels of exposure.  In humans, PFOA and PFOS remain in the body for years.  Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present, and only increase health risks over time.

23.     PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

24.     PFAS are toxic and cause significant adverse effects to human health.  Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.  In addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

25.     The more research done on PFAS only shows more adverse health impacts associated with PFAS. For example, a January 2026 study found that higher blood levels of PFOA and perfluoroheptanoic acid (PFHpA) were linked to a markedly increased risk of metabolic dysfunction-associated steatotic liver disease (MASLD) (formerly known as fatty liver disease) in teens.[3] The study found that adolescents with roughly double the blood levels of some PFAS (for example PFOA and related compounds) were nearly three times more likely to have MASLD, especially when combined with genetic risk factors affecting liver fat storage.

26.     PFAS in general cause significant health impacts, such as diminished antibody responses to vaccines and reduced immune cell function leading to increased susceptibility to infections.

27.     EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.

---

[3] *See* Shiwen Li, et al., *Associations between per and polyfluoroalkyl substances and metabolic dysfunction-associated seatotic liver disease in adolescents and young adults: modifying roles of age, lifestyle factors, and PNPLA3 genotype*, Enviro. Research Vol. 288, Part 2 (2026), available at https://www.sciencedirect.com/science/article/pii/S0013935125025733.

28.     PFOA exposure is suspected to cause cancer, including kidney cancer and testicular cancer. Other PFOA health effects include thyroid disease, immune system suppression, and reproductive and developmental effects among pregnant women.[4]

29.     PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

30.     EPA has identified health risks associated with PFNA, especially through drinking water.   These include developmental effects, immune system impacts, thyroid issues, and neurodevelopmental problems.  PFNA has been used in products including cleaning and polishing products and is a breakdown of other PFAS.

31.     MassDEP studies on PFAS6 Chemicals in laboratory animals and studies of exposed people indicate that exposure to elevated levels of PFAS6 compounds may cause developmental effects in fetuses during pregnancy, effects on thyroids, liver, kidneys hormone levels and immune system.[5]

32.     Research indicates exposure to PFHxS has been linked to various potential health effects, including impacts on the thyroid, affecting metabolism, development, and neurological function; liver toxicity and increased incidence of liver tumors; developmental issues, such as delayed puberty and reduced birth weight; and potential kidney damage.  PFHxS is particularly persistent in humans, with a half-life of 5-8 years.  Chronic exposure to PFHxS, such as consuming

---

[4] Agency for Toxic Substances and Disease Registry (ATSDR), Health Effects of PFAS Exposure, Clinical Overview, (November 12, 2024), available at:  https://www.atsdr.cdc.gov/pfas/hcp/clinical-overview/health-effects.html

[5] Massachusetts Department of Environmental Protection (MassDep), *Per and Polyfluoroalkyl Substances (PFAS) in Drinking Water: Questions and Answer for Consumers*, ( May 24, 2024), available at: Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water: Questions and Answers for Consumers

contaminated drinking water over an extended period, poses serious health risks.  PFHxS is used in water and stain coatings for consumer products like electronics and packaging.  It has been used industrially as a surface protection agent for cleaning and polishing products, and other industrial fluids and water-proofing agents.

33.    On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water.  EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) under the Safe Drinking Water Act.[6]  On May 14, 2025, the Trump Administration announced that EPA would retain drinking water standards for PFOA and PFOS and reevaluate standards EPA had set for others.[7]

34.    Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[8]  Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

**B.    PFAS in the Town of Groveland, MA Water Supply**

35.    Plaintiff, Town of Groveland, Massachusetts, is a Massachusetts political subdivision with its principal place of business at 183 Main Street, Groveland, Massachusetts.

---

[6] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[7] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), *available at*:  https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[8] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

36. Groveland is a municipal public water supplier that owns and operates the Groveland Water Department, Public Water System ID No. 3116000, providing drinking water to residents and businesses in Groveland, Massachusetts.

37. Groveland's public water system relies on three groundwater production wells (Main Street GP Well 1 – Source ID 3116000-01G, GP Well 3 Merrimack River – Source ID 3116000-03G, and GP Well 4 Merrimack River – Source ID 3116000-04G) located in two separate Zone II wellhead protection areas.

38. The Source Water Assessment and Protection (SWAP) program is a requirement of the federal Safe Drinking Water Act that obligates every state to inventory land uses within the recharge areas of all public water supply sources, assess each source's susceptibility to contamination from those land uses, and publicize the results to support improved protection. The Massachusetts Department of Environmental Protection ("MassDEP"), in its 2004 Source Water Assessment and Protection ("SWAP") Report for the Groveland Water Department, determined that the aquifers supplying the Town's wells have "high vulnerability to contamination due to the absence of hydrogeologic barriers (*i.e.*, clay) that can prevent contaminant migration."[9]

39. MassDEP's SWAP Report for Groveland identified a specific "Zone II" recharge area. A Zone II recharge area is the mapped land area that supplies water to a public drinking-water well. It is identified through hydrogeologic studies as the place where rain and surface water soak into the ground, enter the aquifer, and move through groundwater to the well when it is pumping. Because this area represents the well's actual groundwater "capture zone," contamination released at a facility located within Zone II does not have to travel far or cross natural barriers—it can

---

[9] Massachusetts Department of Environmental Protection, *Source Water Assessment and Protection (SWAP) Report for Town of Groveland* (February 26, 2002), *available at* https://www.mass.gov/doc/central-region-source-water-assessment-protection-swap-program-reports-0/download

infiltrate soil, enter groundwater, and be carried directly toward the drinking-water source. Where the aquifer lacks protective layers such as clay (like in the Town), this underground pathway is even more direct, increasing the likelihood that chemicals spilled, leaked, or improperly handled at a site can migrate to the well. For these reasons, regulators treat Zone II areas as highly sensitive.

40.     PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and (PFHxS) are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR5"), a rule EPA promulgated under the Safe Drinking Water Act.[10] This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems, and in particular "emerging contaminants" like PFAS. The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

41.     In 2024, Water quality testing was completed in accordance with the MassDEP and EPA required methodologies and showed that Groveland has elevated levels of PFBS, PFHpA , PFHxS, PFHxA, PFNA, PFOS, and PFOA in its drinking water. Groveland collected water samples and tested for contaminants in accordance with the EPA's UCMR rule. The following are some of the results, which are expressed in parts per trillion.

| PFAS (substances) | Year Sampled | Amount detected |
| --- | --- | --- |
| PFBS | 2024 | 2.06 |
| PFHpA | 2024 | 4.1 |
| PFHxS | 2024 | 4.8 |
| PFOS | 2024 | 2.22 |
| PFOA | 2024 | 7.3 |

[10] Final Rule, *Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings*, 86 Fed. Reg. 73131 (Dec. 27, 2021).

42.    The above test results show that PFOA exceeds the federal standard.

43.    As a result of the PFAS contamination in its drinking water supply, Groveland has begun a major capital project to build a new filtration plant that will comply with EPA's updated MCLs for PFOA and PFOS. The new treatment plant is designed to remove PFAS compounds from the Town's drinking water using a two-stage filtration process. Under this design, groundwater pumped from Groveland's wells will first pass through greensand filters to remove naturally occurring iron and manganese, which would otherwise clog the downstream PFAS treatment media. After greensand filtration, Groveland's water will be treated using granular activated carbon ("GAC") filters that are expressly intended "to extract PFAS" from the drinking water before it is delivered to customers.

44.    The total capital cost of this PFAS-driven project is in the tens of millions of dollars, financed over decades by Groveland's water users, and Groveland will incur substantial ongoing operation and maintenance costs to operate PFAS treatment for as long as PFAS remain in its source waters.

45.    Groveland has also incurred, and will continue to incur, substantial costs for investigation, monitoring, hydrogeologic evaluation, engineering studies, regulatory compliance, public communication, and other response actions undertaken to address PFAS contamination in its wells and distribution system and to protect public health.

46.    But for the PFAS contamination of its drinking water supply, Groveland would not have to build this new plant. Groveland's decision to undertake this multi-million-dollar capital project, including the design and construction of PFAS-specific GAC filtration, is a direct and

12

foreseeable consequence of contamination of its groundwater sources with PFAS originating from Defendants' facilities.

47.     The Town has three wells: Well # 1 is located at 462 Main Street; Well # 3 is located in Pines Recreation area; and Well # 4 located further down the Merrimack River from Well 3. All three wells are adjacent to the Merrimack River.

48.     The Merrimack River passes through the Town of Groveland. The river originates in New Hampshire and flows southward through New Hampshire and then turns eastward into Massachusetts, before reaching the Atlantic Ocean.

49.     The Merrimack River, which flows adjacent to and passes through the Town's, receives treated wastewater effluent and industrial discharges from upstream municipal wastewater treatment plants and industrial facilities, including the named Defendants, that are known or suspected to release PFAS into the Merrimack River. PFAS are highly persistent, water-soluble compounds that are not effectively removed by conventional wastewater treatment and have been documented in the Merrimack River.

50.     Because Groveland's wells are sited in unconfined alluvial aquifers immediately adjacent to the Merrimack River, there is a direct hydraulic connection between the river and the groundwater system that supplies the public water system. MassDEP has specifically noted the absence of low-permeability confining layers that would otherwise limit contaminant migration between surface water and groundwater in these well fields. Alluvial aquifers like Groveland's, and along this portion of the Merrimack Rier, consist of the buried, water-soaked riverbed made of loose sand and gravel. The loose layers act like sponges, with river water filling the spaces between the sand and gravel.

51. When the Town's wells are pumped, they lower the local groundwater levels and create "cones of depression" in the aquifer, which in turn induce infiltration of river water through the riverbed and banks into the adjacent aquifer. In this setting, a significant portion of the water produced by near-river wells can consist of infiltrated river water that has traveled a short distance through the riverbank sediments before being captured by the wells.

52. As a result of this induced infiltration and bank-filtration process, PFAS present in the Merrimack River from upstream sources are transported into the aquifer and migrate laterally to the capture zones of Groveland's wells at 462 Main Street, at the Pines Recreation Area, and further downstream. Once in the aquifer, PFAS can travel with groundwater flow, remaining detectable over long distances because of their mobility and resistance to degradation.

53. In response to emerging federal and state concern over PFAS contamination of public drinking water, the Groveland began monitoring its three gravel-packed wells for PFAS as part of Massachusetts' PFAS6 regulatory program and, more recently, the EPA's UCMR Rule. Groveland's monitors its water on a very strict sampling schedule and that PFAS6 is included among the regulated contaminants routinely reported to MassDEP, while a broader suite of individual PFAS analytes (including PFBS, PFHxS, PFHpA, PFHxA, PFNA, PFOS, PFOA, and PFPeA) is tracked and disclosed as unregulated contaminants to support future federal regulation. Groveland participates in UCMR5 so that EPA can evaluate the occurrence of PFAS in public water systems nationwide and determine whether additional enforceable standards are warranted.

54. The Defendants knew, or should have known, that PFAS, and their degradation products and ingredients, create a substantial risk of harm to groundwater and members of the public who consume such groundwater.

55.    Defendants knew or should have known, that the PFAS containing products that they were, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm of contaminating the ground, soil, groundwater, the aquifers, and to members of the public whose water supply originates with the groundwater, therefore, Plaintiff's Water Source.

56.    Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS from their properties as to cause severe contamination of ground, soil, groundwater, and/or aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

57.    As a direct result of Defendants' careless and negligent acts and omission, PFAS have percolated the soil and reached the aquifer from which Plaintiff draws potable water to supply its customers.

58.    As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated from the release and/or releases of Defendants' toxic and hazardous substances thereby rendering the aquifer from which Plaintiff draws it potable water unusable without extensive and expensive treatment.

## C.    Users of PFAS

59.    The EPA has established a list from the North American Industry Classification System ("NAICS") Codes and Standard Industrial Classification System ("SIC") Codes, based on

EPA records, for entities that have a high risk for the use of PFAS.[11]  EPA uses this data in its PFAS Analytical Tools.[12]

60.    Each Defendants' facility, or facilities, release or released PFAS that reach the zone of capture of the Town's  public supply wells, and each facility has one or more of EPA's identified high risk PFAS NAICS and SIC codes, and PFAS released from them migrated to Plaintiff's Water Source.

61.    Contamination from industrial and commercial operations, like those of the Defendants, can significantly impact groundwater used for Plaintiff's drinking water supplies.

62.    PFAS were and are released from Defendants' facilities via several pathways. These pathways include spills, when contamination is spilled on the ground and leaches into soils and the underground aquifers; wastewater discharge, when PFAS contaminated wastewater is discharged directly into waterways, including groundwater; via sanitary sewers, which then leak into the ground and groundwater; solid waste, and PFAS contaminated solid waste and/or sludge leaching into groundwater and surface water; air emissions, with PFAS released during the manufacturing processes and depositing on soils and water via atmospheric deposition; surface runoff, where PFAS contaminants on the ground get picked up via rainfall or snowmelt and flow to surface waters or migrate to groundwater, via a municipal separate stormwater sewer or otherwise.

63.    All of the above pathways have been found to be significant migration patterns for PFAS compounds.

---

[11] *See, e.g.,* EPA, *Metadata for Data Sources within PFAS Analytic Tools (Public)*, July, 2022, *available at*: https://echo.epa.gov/system/files/PFASAnalyticToolsPUBLICMetadata7-13-2022.508_0.pdf.

[12] *See* EPA, PFAS Analytical Tools, *available at*:  https://echo.epa.gov/trends/pfas-tools.

64.     The extreme stability of PFAS compounds means that natural systems that might filter out or mitigate the migration of other contaminants are not as effective for PFAS compounds, the same is true for traditional wastewater treatment plants.

65.     Significantly, the very low threshold for PFAS compounds in drinking water, which is several orders of magnitude smaller than many other contaminants, means that even a *de minimis* amount of PFAS can have a big impact on a drinking water supply.

66.     As a result of Defendants' tortious actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFAS and PFAS-containing materials at, near, or within the vicinity of the source water protection area for Plaintiff's Water Source, PFAS have been caused to migrate into and exist in Plaintiffs' Water Source and property, thereby damaging and injuring Plaintiff.

67.     Defendants, as the responsible parties, and not Plaintiff, their taxpayers, or their customers, should bear all past, present, and future costs of addressing the above contamination and removing PFAS from the water supply.

68.     Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## THE PARTIES

## PLAINTIFF

69.     **Plaintiff, TOWN OF GROVELAND, MASSACHUSETTS,** is a Massachusetts political subdivision with its principal place of business at 183 Main Street, Groveland MA 01834. The Town owns, manages, operates, and controls its water supply system, including maintenance and improvements of its water treatment plants and its public water supply wells.

70.     At all relevant times herein, the Town owned and operated and has been charged with the responsibility of delivering safe, reliable, and high-quality drinking water that meets state and federal standards to residents and businesses of the Town of Groveland.

71.     At all relevant times herein, the sole source of water utilized by the Town to provide drinking water to the residents and businesses is groundwater drawn from three (3) groundwater wells.

## DEFENDANTS

72.     As a direct result of Defendants' careless and negligent acts and omissions, PFAS entered the soil and groundwater at their facilities and/or properties, or the Merrimack River, and contaminated the aquifer from which Plaintiff draws potable water to supply its customers.

73.     As a direct result of Defendants' acts and omissions, which are the sole and direct cause of Plaintiff's injuries, Plaintiff's wells have become contaminated with PFAS, causing damages to Plaintiff's property and requiring Plaintiff to incur costs, as described above.

74.     Defendants' wrongful actions and omissions, which are contributing to the presence of PFAS in Plaintiff's wells, are continuing and ongoing.

75.     Any and all references to a Defendant or Defendants in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

76.    When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

77.    When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

78.    Upon information and belief, each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and has caused and continues to cause injuries and damages to Plaintiff, either through the defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

79.    Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the actions and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiff, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

80.    **Defendant, SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION,** is a corporation organized under the laws of the State of California and registered to do business in the Commonwealth of Massachusetts ("Saint-Gobain"). The name and

address of Saint-Gobain's registered agent is C T Corporation System, 155 Federal Street, Suite 700, Boston MA 02110.

81.    Upon information and belief, Saint-Gobain is part of the multinational conglomerate Compagnie de Saint-Gobain, one of the world's largest industrial materials companies. Saint-Gobain has thousands of employees worldwide and dozens of manufacturing sites globally.

82.    Saint-Gobain has a large footprint in Massachusetts, including a corporate office at 25 Corporate Drive, Burlington, Massachusetts; a manufacturing facility a 717 Plantation Street, Worcester, Massachusetts; a manufacturing facility at 700 Warner Boulevard, Taunton, Massachusetts; a research facility in Northborough, Massachusetts; and a manufacturing facility in Northampton, Massachusetts.

83.    Saint-Gobain also owns and operates, and at all relevant times has owned and operated, a fluoropolymer manufacturing and coated-fabrics facility located at 701 Daniel Webster Highway in Merrimack, New Hampshire (the "Merrimack Facility"). The New Hampshire Department of Environmental Services ("NHDES") identifies the site under Site No. 199712055 in the state remediation program.

84.    The Merrimack Facility has been a fluoropolymer processing plant since at least 1974. Upon information and belief, General Electric built and operated the facility from 1974 to 1984, ChemFab Corporation acquired and operated the facility from 1984 to 2000, and Saint-Gobain acquired ChemFab in 2000. Saint-Gobain has owned operated the facility from 2000 to the present. During all these periods, the Merrimack Facility's core industrial activity has been the manufacture of coated fabrics and cast films using fluoropolymer dispersions; that is, use of PFAS.

85.    At the Merrimack Facility, Saint-Gobain manufactures "engineered, high-performance polymer products" and engages in weaving, lamination, coating, casting, and fabrication processes. The facility coats fiberglass, Kevlar, and Nomex fabrics with polytetrafluoroethylene ("PTFE") (also known as Teflon) and other fluoropolymer dispersions and fabricates cast films and composite products. Products manufactured at the facility include, among other things, radar radomes (a weatherproof dome for radar) for the U.S. Department of Defense, components for 5G communications equipment, chemical- and biological-protective suits, filtration and medical components, and food-service products such as grill release sheets and toaster belts.

86.    The Merrimack Facility's industrial classification has included SIC codes 2228 (weaving mills and textile finishing) and 2819/2821 (industrial chemicals, plastic materials, synthetics), reflecting its role as a fluoropolymer coater and film manufacturer. These operations place the facility squarely within an industry sector known to use and handle PFAS in coating dispersions, surfactants, and polymer systems.

87.    From at least 2004 through 2015, Saint-Gobain used aqueous fluoropolymer dispersions at the Merrimack Facility that contained ammonium perfluorooctanoate ("APFO"), the ammonium salt of PFOA, as a surfactant and polymerization aid. Saint-Gobain has admitted that PTFE, fluorinated ethylene propylene ("FEP"), and perfluoroalkoxy alkane ("PFA") dispersions used at the facility during this period may have contained APFO as a component supplied by raw-material vendors, even though APFO was not purchased as a neat raw material. Saint-Gobain further acknowledges that APFO-containing dispersions were used at the facility at least as early as 2004 and that APFO content declined over time until being fully eliminated from incoming materials by 2015.

88.     The Merrimack Facility's manufacturing process involved dipping fabrics into aqueous fluoropolymer dispersions containing PFOA and other PFAS, then drying and curing those fabrics in ovens, and casting films from similar dispersions. ChemFab previously operated the same equipment and processes at the site as early as 1986, using PFOA-containing dispersions, so that PFAS-laden coating operations have been conducted at the facility for decades under both ChemFab and Saint-Gobain ownership.

89.     Extensive environmental investigations at and around the Merrimack Facility have documented widespread PFAS contamination in soil, groundwater, surface water, stormwater, air emissions, stack tar, rooftop deposits, and facility dispersions. NHDES and Saint-Gobain's consultants have identified at least 23 PFAS compounds in environmental media, including PFOA, PFOS, PFHxA (perfluorohexanoic acid), PFHpA (perfluoroheptanoic acid), PFNA (perfluorononanoic acid), multiple perfluorosulfonic acids, and precursor compounds that degrade to perfluoroalkyl acids.

90.     Groundwater samples collected from monitoring wells at the Merrimack Facility have detected PFOA at concentrations up to 7,300 ng/L (ppt) and PFOS up to 440 ng/L (ppt), grossly exceeding EPA's drinking water MCL for PFOA and PFOA of 4.0 ppt. Soil samples collected on-site have contained PFOA at up to 160 ppb and PFOS up to 48 ppb, along with detectable levels of multiple other PFAS. PFAS have also been detected in rooftop wipe samples and char inside emission stacks, confirming releases via air emissions and deposition onto the facility and surrounding environment.

91.     From at least 2002 until 2015, Saint-Gobain routinely discharged wastewater containing PFAS from equipment washing, dispersion pan and tote rinsing, and certain sinks directly into the municipal sanitary sewer system serving Merrimack, without PFAS-specific

treatment. Plant wash water from dispersion rinse-downs and process sinks was captured in floor drains, conveyed through trenches and sumps, and discharged to the sewer, sometimes through settling tanks but in many cases, prior to 2015, through sinks and lines plumbed directly to the sewer.

92.     Solid residues and sludges containing PFAS from settling tanks and overhead lines were historically handled in a manner that allowed PFAS-containing solids to enter the sewer system. Before December 2015, Saint-Gobain obtained permission from the publicly owned treatment works ("POTW") to flush solids from tank and line cleanings into the sanitary sewer. In August 2011, less than one gallon of undiluted PTFE formulation (*i.e.,* Teflon) was discharged into a production sink and flowed through sumps and settling tanks into the sewer; on September 23, 2012, approximately 200 gallons of a formulation containing APFO spilled during a transfer and required response; and in June 2015, roughly 99 pounds of non-hazardous PFAS-containing formulation spilled and migrated outside the building at slab level. These incidents are in addition to routine, chronic PFAS discharges from normal operations.

93.     Air-emissions testing in 2004 at the Merrimack Facility showed PFOA emissions exceeding New Hampshire's ambient air limits under the state's regulated toxic air pollutants program. In 2005, NHDES cited Saint-Gobain for violating APFO emission standards and issued an Administrative Order by Consent requiring the company to reformulate its coatings to reduce PFOA content by the end of 2006. Follow-up stack testing in 2007 confirmed PFOA emission reductions of more than 96% from 2004 levels, but only after years of uncontrolled PFAS air emissions had deposited PFOA and other PFAS onto local soils and surfaces.

94.     After 2015, in response to regulatory scrutiny and evidence of PFAS contamination, Saint-Gobain installed and operated a process-water pretreatment system at the Merrimack

Facility. This system equalizes, chemically adjusts, coagulates, and settles PFAS-containing wastewater, removes solids, and then passes the supernatant through bag filters and granular activated carbon ("GAC") for PFAS removal prior to discharge to the municipal sewer. Saint-Gobain's industrial discharge permit was revised in 2017 and 2020 to incorporate PFAS monitoring and optimization of this pretreatment system. These changes demonstrate that Saint-Gobain's operations generated PFAS-laden wastewaters of sufficient concern to require pretreatment and PFAS-specific monitoring.

95.    Despite these belated controls, NHDES and Saint-Gobain's environmental investigations have found that PFAS from the Merrimack Facility have impacted not only on-site soil and groundwater, but also off-site private wells and downgradient groundwater and surface-water bodies. Saint-Gobain entered into a Consent Decree with NHDES obligating it to investigate and remediate PFAS contamination and to provide alternate water supplies to properties where PFAS in drinking-water wells exceeded Ambient Groundwater Quality Standards. This state remediation program (Project/Facility ID 36430) is focused on PFAS impacts emanating from the Merrimack Facility.

96.    In addition to groundwater and sewer discharges, Saint-Gobain's PFAS-containing emissions and wastes have reached the Merrimack River via contaminated groundwater that flows toward and discharges into a nearby brook that drains to the Merrimack River, as documented by NHDES and the Agency for Toxic Substances and Disease Registry in their evaluations of private wells near the Saint-Gobain site. PFAS-laden wastewater historically discharged to the municipal sewer likewise passed through the POTW and into the Merrimack River in treated effluent, because conventional wastewater treatment does not remove PFAS.

24

97.    The Merrimack River flows south from Merrimack, New Hampshire through Nashua and into Massachusetts where it reaches Groveland. Groveland's public-supply wells #3 and #4 are located along this reach of the Merrimack River and are known to induce bank filtration, drawing a portion of their recharge from river water that infiltrates through the riverbed and banks into the alluvial aquifer. PFAS present in the river from upstream sources, including the Saint-Gobain Merrimack Facility and multiple wastewater-treatment and landfill leachate inputs, therefore enter the aquifer feeding Groveland's wells through induced infiltration.

98.    PFAS are highly persistent and mobile in water; they do not degrade appreciably over the hours-to-days time scales associated with river transport along the 50-mile reach between Merrimack and Groveland. As a result, PFAS released from the Merrimack Facility to the brook, to groundwater discharging to the Merrimack, and to the sewer system discharging to the Merrimack have contributed to the PFAS burden in the river water that is hydraulically connected to Groveland's riverbank-influenced wells.

99.    Unlike many conventional pollutants, PFAS do not readily degrade, volatilize, or permanently bind in ways that would prevent downstream transport; instead, they remain dissolved in the water column and move with river flow, subject primarily to dilution rather than elimination. Environmental monitoring nationwide has repeatedly documented PFAS transported tens to hundreds of miles in major river systems, including detections at downstream drinking-water intakes far from original release points. In a river of the size and flow of the Merrimack, this well-established environmental behavior makes it scientifically foreseeable and hydrologically plausible that PFAS discharged or otherwise released to the river in Merrimack, New Hampshire, would migrate downstream and contribute to contamination of Groveland's Water Source. Courts addressing water-pollution claims routinely recognize that contaminants released into

hydrologically connected upstream waters can cause downstream impacts, and PFAS—because of their persistence and mobility—fit squarely within that recognized framework of downstream transport and exposure.

100.    The PFAS compounds identified in Groveland's water—long-chain PFAS such as PFOA and PFOS and associated shorter-chain PFAS—are the same classes of compounds documented at high concentrations in environmental media at and downgradient of the Merrimack Facility.

101.    The Merrimack River and its alluvial aquifer act as an integrated hydrologic system.[13] PFAS released from Saint-Gobain's Merrimack Facility have entered that system through on-site soil and groundwater contamination, discharges to the municipal sewer and POTW, air emissions and atmospheric deposition, and stormwater/runoff pathways. Those PFAS migrate with groundwater to PFAS-impacted brooks and private wells near the facility and are transported via the Merrimack River downstream into Massachusetts, where Groveland's riverbank-influenced wells intercept a portion of the PFAS-contaminated river water through bank filtration and induced infiltration.

102.    Through this combination of direct PFAS releases to groundwater and sewer at the Merrimack Facility, and subsequent transport of PFAS via groundwater and the Merrimack River into the alluvial aquifer supplying Groveland's wells, Saint-Gobain's operations have contributed to the PFAS contamination now documented in Groveland's Water Source.

103.    Despite Saint-Gobain knowledge of the use of Perfluorinated compounds and emissions therefrom at Merrimack, New Hampshire plant. Defendant failed to test the wells at or

---

[13] An alluvial aquifer is a buried, water-soaked riverbed made of loose sand and gravel.

near the Merrimack plant. Furthermore, Defendants failed to warn plaintiffs that the well and the groundwater at or near the plant of Merrimack were contaminated.

104.    In or around 2016 High levels of PFAS were detected un hundreds of private wells across Merrimack and surrounding towns. The contamination was traced back to the facility's emissions and used of the chemical compounds.[14]

105.    In or around August 2023, Saint-Gobain announce the closure of the Merrimack facility in New Hampshire, the company ceased all operations around May of 2024 and initiated plans to demolish the facility. As of July, 2025 the Saint- Gobain facility has been fully demolished.

106.    Although the facility has been demolished the site remains heavily contaminated with PFAS that continue to leach and ultimately reach Groveland's Water Source.

107.    **Defendant, WASTE MANAGEMENT OF NEW HAMPSHIRE, INC.,** is a corporation organized under the laws of the State of Connecticut and registered to do business in the Commonwealth of Massachusetts ("Waste Management"). Waste Management is a wholly owned subsidiary of Waste Management, Inc. Waste Management's registered agent is CT Corporation, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.

108.    Waste Management owns and operates the Turnkey Landfill, also known as Turnkey Recycling and Environmental Enterprises, a large municipal solid waste landfill located in Rochester, New Hampshire ("Turnkey Landfill").

109.    The Turnkey Landfill is one of the largest landfills in New England, encompassing approximately 1,200 acres, and accepts more than one million tons of waste annually, more than

---

[14] https://newhampshirebulletin.com/briefs/saint-gobain-completes-demolition-of-merrimack-facility-embroiled-in-pfas-pollution-scandal/?utm_source=chatgpt.com

half of which is imported from out of state, including hundreds of thousands of tons of waste from Massachusetts each year.

110.    Waste Management operates Turnkey as a regional disposal facility receiving municipal solid waste, industrial waste, construction and demolition wastes, and other materials that contain or generate leachate with elevated concentrations of PFAS, including PFOA, PFOS, and related compounds.

111.    Leachate and runoff generated at the Turnkey Landfill contain very high levels of PFAS. Testing shows PFOS detection in six Turnkey groundwater monitoring wells and PFOA in three wells, indicating PFAS migration to groundwater from the landfill. In addition, Landfill leachate from Turnkey is significantly contaminated with PFAS.[15]

112.    Waste Management manages Turnkey Landfill leachate using several methods: (a) recirculation on-site within the landfill; (b) conveyance of some leachate to the City of Rochester sewer after pretreatment; and (c) shipment of substantial quantities of leachate and runoff, essentially untreated for PFAS, by truck to off-site POTWs, including the Lowell Regional Wastewater Utility ("MA Wastewater Utility").

113.    From at least 2013 until November 2019, Waste Management arranged for significant volumes of PFAS-contaminated runoff and leachate from the Turnkey Landfill to be hauled to the MA Wastewater Utility in Lowell, Massachusetts. During this period, the MA Wastewater Utility accepted up to approximately 100,000 gallons per day of Turnkey runoff and landfill leachate containing high levels of PFAS. Turnkey Landfill did not attempt to eliminate any PFAS from this leachate before sending it to the MA Wastewater Utility.

---

[15] EPA explains that landfill leachate is a liquid "formed when rainwater filters through wastes placed in a landfill. When this liquid comes in contact with buried wastes, it leaches, or draws out, chemicals or constituents from those wastes." EPA, Municipal Solid Waste Landfills, available at https://www.epa.gov/landfills/municipal-solid-waste-landfills (last visited Feb. 13, 2026).

114.    The MA Wastewater Utility publicly acknowledged this arrangement and the PFAS contamination of the Turnkey Landfill's runoff. On November 6, 2019, the Lowell Wastewater Utility issued a press release titled "Wastewater Utility to Suspend Acceptance of Runoff from Turnkey Landfill in Rochester, New Hampshire" stating that the Utility "will suspend acceptance of runoff from the Turnkey Landfill … as a result of the presence of polyfluoroalkyl substances (PFAS) in that runoff." LRWU's press release identified the runoff from Turnkey as containing "a high level" of PFAS.[16]

115.    Environmental organizations and wastewater employees reported that Turnkey leachate contained PFAS at levels far above health guidelines and that this leachate was being discharged to the Merrimack River.

116.    Like most wastewater treatment plants, the MA Wastewater Utility does not have PFAS-specific treatment technologies. Conventional wastewater treatment processes did not remove the PFAS-contaminated Turnkey leachate entering the MA Wastewater utility; they pass through the plant and are discharged with treated effluent to the Merrimack River at Lowell.

117.    EPA's NPDES fact sheet and Response to Comments for the MA Wastewater Utility permit explicitly recognized that significant amounts of landfill leachate from Turnkey, contaminated with PFAS, were discharged to the Merrimack River. Federal and state officials have publicly stated that toxic PFAS chemicals from landfill leachate and wastewater discharges "can be dumped into the Merrimack River" under existing permits and that these discharges are a major PFAS source to the river.

---

[16] City of Lowell, MA Press Release "Wastewater Utility to Suspend Acceptance of Runoff from Turnkey Landfill" (Nov. 7, 2019, available at https://www.lowellma.gov/DocumentCenter/View/9503/PRESS-RELEASE-Wastewater-Utility-to-Suspend-Acceptance-of-Runoff-from-Turnkey-Landfill_11719

118.    The Merrimack River segment receiving the Water Utility's effluent at Lowell flows downstream to Haverhill and then past Groveland, Massachusetts. MassDEP and U.S. Geological Survey ("USGS") studies of PFAS in Massachusetts rivers have documented PFAS in every sampled river and have specifically identified higher PFAS concentrations in the Merrimack at downstream locations influenced by wastewater discharges, including below Lowell, than in upstream reaches.

119.    Groveland's Wells #3 and #4 are located along the Merrimack River and are hydraulically connected to the river through bank filtration. Pumping at these wells induces infiltration of river water through the riverbed and bank sediments into the alluvial aquifer, meaning that some fraction of the water produced by these wells is derived from Merrimack River water that has passed through the riverbank.

120.    PFAS released from Waste Management's Turnkey Landfill into the MA Wastewater Utility's influent, and subsequently discharged in its effluent, enter the Merrimack River in Lowell and are transported downstream towards Groveland. PFAS are highly persistent and mobile; they do not degrade appreciably over the hours-to-days timescales associated with river transport from Lowell to Groveland over a distance on the order of tens of miles.

121.    As this effluent mixes into the Merrimack River, PFAS from Turnkey Landfill leachate become part of the river's cumulative PFAS load. That PFAS-contaminated river water is drawn into the alluvial aquifer by induced infiltration at Groveland's riverbank wells and is captured by Wells #3 and #4, thereby introducing PFAS originating in Turnkey Landfill leachate into Groveland's public water supply.

122.    PFAS compounds detected in Groveland's water—including long-chain perfluoroalkyl acids (e.g., PFOA, PFOS, PFNA) and shorter-chain PFAS (e.g., PFHxA, PFPeA,

PFBA, PFBS)—are the same classes of PFAS documented in landfill leachate and wastewater effluents discharging to the Merrimack, including those from Turnkey Landfill leachate.

123. Waste Management, as owner and operator of Turnkey, knew or should have known that landfill leachate and runoff from a large regional landfill receiving mixed municipal and industrial waste streams would contain PFAS at elevated concentrations, and that trucking this leachate to the MA Wastewater Utility, which like most such facilities lacked PFAS-specific treatment, would result in PFAS discharges to the Merrimack River and, consequently, to downstream drinking-water supplies such as Groveland's.

124. Waste Management is a "person" within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601(21), and has arranged for the "treatment" and "disposal" of PFAS-containing wastes—specifically, Turnkey leachate and runoff—at one or more "facilities," including the Lowell Regional Wastewater Utility, from which there have been "releases" or "threatened releases" of PFAS, which are "hazardous substances," "pollutants," and/or "contaminants," into the environment. 42 U.S.C. §§ 9601(9), 9601(14), 9601(22).

125. The PFAS discharges from the wastewater plant into the Merrimack River that contain PFAS originating in Turnkey Landfill leachate are "releases" or "threatened releases" of hazardous substances within the meaning of CERCLA. Through induced bank filtration and groundwater capture at Groveland's wells, these releases have resulted in the presence of PFAS in Groveland's groundwater supply and distribution system.

126. As a direct and proximate result of the releases and threatened releases of PFAS associated with Waste Management's Turnkey Landfill leachate, Groveland has incurred and will continue to incur "response costs" within the meaning of 42 U.S.C. § 9607(a)(4), including,

31

without limitation, costs for investigation, monitoring, engineering and hydrogeologic studies, design and construction of PFAS treatment systems, operation and maintenance of such systems, regulatory compliance, and public outreach.

127. These response costs are necessary to address the release and threatened release of PFAS to the environment, to protect public health and the environment, and are consistent with the National Contingency Plan.

128. Waste Management owed Groveland and its residents a duty to exercise reasonable care in the management of PFAS-contaminated leachate from the Turnkey Landfill and in its decisions to ship such leachate to a facility that lacked PFAS-specific treatment and discharged effluent directly to the Merrimack River, a known drinking-water source.

129. Waste Management breached that duty by, among other things, (a) failing to adequately characterize and control the PFAS content of Turnkey Landfill leachate; (b) selecting a disposal arrangement that predictably resulted in PFAS discharges to a major drinking-water river; (c) failing to implement feasible alternative disposal or treatment options that would reduce PFAS releases; and (d) continuing to ship PFAS-laden leachate to the wastewater plant until public scrutiny forced the utility to suspend acceptance of Turnkey runoff.

130. Waste Management's acts and omissions were negligent, unreasonable, and created a foreseeable and substantial risk that PFAS from Turnkey would contaminate downstream drinking-water supplies, including Groveland's alluvial wells. The contamination of Groveland's groundwater and water-supply infrastructure with PFAS constitutes a continuing nuisance and trespass, as PFAS from Turnkey leachate have invaded, and continue to invade, Groveland's property and water resources, interfering with Groveland's rights to use and enjoy its property and to provide safe drinking water to its residents.

131.    Waste Management's conduct has been a substantial contributing factor to the PFAS burden in the Merrimack River at and above Groveland, and to the PFAS contamination of Groveland's drinking-water supply, even if other entities also contributed PFAS to the river and to Groveland's aquifer. Groveland seeks recovery of all past and future response costs under CERCLA and applicable state analogues, and compensatory and other damages under common-law theories including negligence, nuisance, and trespass, arising from Waste Management's role in arranging for and effectuating the discharge of PFAS from the Turnkey Landfill through the Lowell Regional Wastewater Utility to the Merrimack River and into Groveland's drinking-water supply.

**Haverhill Paperboard Mill**

132.    **Defendant, HAVERHILL PAPERBOARD CORP.,** is a corporation organized under the laws of the Commonwealth of Massachusetts ("Haverhill Paperboard").

133.    Haverhill Paperboard owned and operated a paperboard manufacturing facility located at or near 100 South Kimball Street in Haverhill, Massachusetts, on the south bank of the Merrimack River within the Merrimack River watershed. Haverhill Paperboard's mill operated continuously for more than a century after opening in approximately 1902, and closed on or about August 29, 2008, following public announcements that the 105-year-old paper mill would cease operations.

134.    Throughout the period from at least the 1960s until its closure, Haverhill Paperboard operated as a recycled paperboard mill producing "boxboard" and related paperboard grades for packaging and carton applications, using deinked grades and other recovered papers as its principal supply. Haverhill Paperboard manufactured boxboard from recycled fiber and as part of a recycled paperboard and packaging group that included the Newark Group's Massachusetts

33

paperboard plants. Haverhill Paperboard's operations included surface-coating lines subject to Massachusetts and federal volatile organic compound (VOC) regulations applicable to paper and packaging coating facilities, indicating that the mill applied surface coatings to its paperboard products.

135.    Plaintiff alleges upon information and belief, based on the nature of Haverhill Paperboard's products and the practices of the paperboard packaging industry during the relevant decades, that Haverhill Paperboard manufactured coated paperboard grades, including clay-coated and other surface-treated boxboard, to supply printed folding cartons, packaging board, and related products for consumer and commercial uses. In the paper and paperboard industry, including mills located along the Merrimack River, grease- and oil-resistant food-contact paper and paperboard have historically been manufactured using fluorochemical treatments containing PFAS, and environmental and regulatory analyses have identified paper mills using such fluorochemical coatings as significant PFAS sources to downstream drinking-water supplies, including the Merrimack River.

136.    From approximately the 1960s through at least the early 2000s, the paper and paperboard industry relied heavily on long-chain PFAS chemistries—including PFOS, PFOA, and related perfluoroalkyl sulfonates and carboxylates—as active ingredients and impurities in grease-resistant coatings, fluorochemical sizes, and fluorosurfactants used to impart oil and water repellency to food-contact paperboard. After about 2002, major PFAS manufacturers began phasing out PFOS/PFOA-based products in favor of short-chain fluorotelomer-based substances such as 6:2 fluorotelomer sulfonate ("6:2 FTS"), 8:2 FTS, and related fluorotelomer acrylates and urethanes, as well as C4-based PFAS such as perfluorobutane sulfonate ("PFBS") and C6 perfluoroalkyl acids such as perfluorohexanoic acid ("PFHxA").

137.    Plaintiff alleges upon information and belief that, during the period when these fluorochemical technologies were standard in the paperboard industry, Haverhill Paperboard used PFAS-containing coatings, sizes, and process additives in its coating and finishing operations to produce grease-resistant, water-resistant, and specialty packaging grades of paperboard, particularly for food-contact and retail packaging applications. Haverhill Paperboard's use of surface-coating lines, its role as a recycled packaging paperboard mill, and its inclusion in a corporate portfolio of packaging board facilities support the inference that it adopted fluorochemical repellent technologies consistent with industry practice along the Merrimack River, which has been specifically identified as vulnerable to PFAS discharges from paper mills using fluorochemical paper coatings.

138.    During its operations, Haverhill Paperboard generated large volumes of process wastewater and whitewater containing residues of coatings, sizes, and other process chemicals, as well as sludges and solid byproducts from fiber screening, primary clarification, deinking, and wastewater treatment. Environmental Protection Agency ("EPA") records document that EPA conducted an "Industrial Waste Survey: Haverhill Paperboard Corporation, Haverhill, Massachusetts," which identified and characterized Haverhill Paperboard's industrial waste effluent and its discharges to the Merrimack River through a Parshall flume and related outfalls. Plaintiff alleges that Haverhill Paperboard's process wastewaters and effluents contained dissolved and fine-particulate PFAS derived from fluorochemical coatings, sizes, and process aids, and that these PFAS-containing effluents were discharged either directly to the Merrimack River under industrial discharge permits or indirectly to the Haverhill municipal wastewater treatment plant, with PFAS subsequently released to the river in treated effluent.

35

139. EPA's Superfund reuse profile for the Haverhill Municipal Landfill states that "[f]rom 1978 to 1996 … byproducts from the paper manufacturing process at the Haverhill Paperboard Company were also disposed of at the landfill." As discussed, earlier in this Complaint, the Haverhill Landfill is directly adjacent to the Merrimack River and has been listed under federal and state hazardous-waste laws because disposal of industrial and hazardous wastes at the site caused contamination of soil, groundwater, and surface water with volatile organic compounds, metals, and other pollutants.

140. Plaintiff alleges that the "byproducts from the paper manufacturing process at the Haverhill Paperboard Company" disposed at the Haverhill Landfill during 1978–1996 included coating sludges, primary clarifier solids, deinking residues, fiber rejects, tank-wash slurries, off-spec coated paperboard, and other solid and semi-solid wastes containing PFAS-based fluorochemical coatings, sizes, fluorosurfactants, and associated PFAS. Plaintiff further alleges that sludge from the Haverhill wastewater treatment plant disposed at the same landfill during this period contained PFAS derived from Haverhill Paperboard's industrial wastewater, consistent with modern evidence that municipal wastewater treatment sludges (biosolids) almost universally contain PFAS and act as concentrated PFAS reservoirs when landfilled.

141. The Haverhill Landfill, situated immediately alongside the Merrimack River, is a direct hydrologic source of contaminants to the river. Historical investigations at the landfill have documented volatile organic compounds, including trichloroethylene (TCE), methylene chloride, and vinyl chloride, as well as metals such as arsenic, lead, mercury, manganese, and chromium, migrated from buried wastes into groundwater beneath the landfill and discharged to surface water, including the Merrimack River, via leachate and groundwater flow. Plaintiff alleges that PFAS contained in Haverhill Paperboard process byproducts and Haverhill wastewater treatment sludges

disposed at the landfill have followed the same leachate and groundwater pathways, with infiltrating precipitation mobilizing PFAS from these wastes into leachate and groundwater and transporting PFAS into the Merrimack River at and near the landfill's riverfront boundary.

142.    The Merrimack River flows downstream from Haverhill and the Haverhill Landfill past the Town of Groveland, whose public drinking water supply relies on groundwater wells and sources influenced by the river.  EPA and state assessments of the Merrimack River watershed have identified upstream industrial discharges, including pulp and paper mills using fluorochemical coatings, as significant contributors of PFAS to the river, and independent analyses have concluded that paper mills on the Merrimack can elevate downstream PFAS concentrations in drinking-water sources above regulatory benchmarks. The Merrimack River's flow, together with bank-filtration and groundwater–surface water interactions, provides a hydraulic connection between PFAS releases from Haverhill Paperboard and the Haverhill Landfill and the groundwater and surface-water resources used by Groveland for its public water supply.

143.    Plaintiff alleges that, as a result of Haverhill Paperboard's historical operations and waste-management practices, PFAS have been released and continue to be released into the environment from multiple pathways: (a) direct and indirect discharge of PFAS-containing process wastewaters from the Haverhill Paperboard mill to the Merrimack River; (b) discharge of PFAS in treated effluent and concentrated PFAS in sludges from the Haverhill wastewater treatment plant; and (c) leaching of PFAS from PFAS-bearing paper manufacturing byproducts and wastewater sludges disposed at the Haverhill Municipal Landfill into groundwater and the Merrimack River. Plaintiff further alleges that these PFAS releases have migrated with river flow and through groundwater–surface water interactions to the vicinity of Groveland's water-supply sources and have caused and contributed to the PFAS contamination detected in Groveland's drinking water.

144.    Plaintiff alleges that PFAS, including but not limited to PFOS, PFOA, PFHxS, PFHxA, PFNA, PFBS, PFBA, PFHpA, and related long- and short-chain perfluoroalkyl acids and fluorotelomer sulfonates (including 6:2 FTS and 8:2 FTS), have been released from the Haverhill Paperboard facility and associated disposal sites into the environment, and that these substances are "hazardous substances," pollutants, and contaminants of concern under federal and state law. Plaintiff alleges that Haverhill Paperboard is a "person" and a responsible party within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Massachusetts General Laws Chapter 21E by virtue of its ownership and operation of a facility at which PFAS and other hazardous substances were released into the environment, and by virtue of its arrangement for the disposal or treatment of PFAS-containing wastes at the Haverhill Landfill and through the Haverhill wastewater treatment plant.

145.    As a result of these releases and disposals, PFAS have been, and continue to be, present in the Merrimack River and in the groundwater and drinking water supplies serving the Town of Groveland. Plaintiff has incurred and will continue to incur necessary response costs to investigate, monitor, and address PFAS contamination in its drinking water system; will incur substantial capital and operating costs to construct and operate PFAS treatment facilities; and has suffered and will suffer injury to its property interests and to the health and welfare of its residents. Plaintiff seeks to recover its response costs and damages, and to obtain injunctive relief and other appropriate remedies, from Haverhill Paperboard under CERCLA and tort law as a result of Haverhill Paperboard's PFAS releases and disposals that have caused and contributed to PFAS contamination of Groveland's drinking water supply.

146.    **Defendant, THE NEWARK GROUP, INC.,** is a corporation organized under the laws of State of New Jersey with its principal office located in the State of Ohio and registered to

38

do business in the Commonwealth of Massachusetts ("Newark Group").  Its registered agent is Corporation Service Company, 84 State Street, Boston MA 02109.

147.    Upon information and belief, in the 1980s the Newark Group purchased Haverhill Paperboard and owned and operated the Haverhill Paperboard mill until it closed.

148.    At all relevant times, the Newark Group was a significant paperboard manufacturer, including operating over a dozen manufacturing facilities across North America.

149.    As the owner and operator of Haverhill Paperboard mill during all relevant times, the Newark Group is liable for PFOA, PFOS, and other PFAS releases from the Haverhill Paperboard mill located at or near 100 South Kimball Street in Haverhill, Massachusetts, on the south bank of the Merrimack River.

150.    **Defendant, UNION MACHINE COMPANY OF LYNN, INC.,** is a Massachusetts Corporation with its principal place of business located in the Commonwealth of Massachusetts. Its registered agent is Eric Harper, Union Machine Company of Lynn, Inc., 6 Federal Way, Groveland Massachusetts 01834.

151.    Defendant Union Machine Co. of Lynn, Inc. ("Union Machine") is, and at all relevant times has been, a Massachusetts corporation engaged in the precision manufacture of aerospace and jet-engine components. Union Machine has operated a manufacturing facility in Groveland, Massachusetts, under the name Union Machine Company of Lynn, Inc., and has done so continuously for decades.

152.    Upon information and belief, Union Machine was founded in or about 1954 and initially operated in or near Lynn, Massachusetts, before relocating primary manufacturing operations to Groveland, Massachusetts. For many years, Union Machine has operated at 6 Federal

39

Way, Groveland, Massachusetts 01834, and has been identified by state and federal records as a defense/aerospace supplier manufacturing high-precision jet-engine and aircraft components.

153. Groveland's SWAP report lists "Union Machine Company of Lynn Inc" as a regulated hazardous-waste generator within the Groveland water-supply protection area and associates Union Machine with the industrial corridor that includes Salem Street and the Federal Way industrial park in Groveland's Zone II. Union Machine's facility lies within the mapped Zone II recharge area for Groveland's public-supply wells.

154. Union Machine's operations in Groveland have included precision machining and grinding of aerospace alloys, computerized numerical control ("CNC") milling and turning, laser cutting and drilling of jet-engine components, and airflow and pressure testing of fuel, air, and turbine parts. These operations intrinsically require the use of metalworking fluids, coolants, cutting and grinding fluids, precision cleaning agents, specialty lubricants and greases, and packaging/coating materials designed for high-reliability aerospace applications.

155. Upon information and belief, in connection with these manufacturing processes, Union Machine has for many years used and handled products containing PFAS or products containing PFAS, including but not limited to PFOA and PFOS in the following ways:

   a. Metalworking coolants and cutting fluids containing fluorinated surfactants used to reduce misting, control foam, and improve lubrication;

   b. Aqueous precision cleaners and detergents formulated with PFAS-based surfactants to achieve low surface tension and residue-free cleaning of jet-engine components; and

c.  Specialty lubricants, greases, coatings, and sealing products containing fluoropolymers and fluorinated additives designed to withstand high temperatures and aggressive fuels and hydraulic fluids.

156.  At all relevant times, Union Machine generated waste streams containing PFAS and other hazardous substances in connection with its operations, including spent metalworking fluids, spent cleaners and rinses, wash-waters, floor-drain discharges, sump and pit liquids, stormwater with contact to manufacturing areas, contaminated sludges, rags, and absorbents, and other plant wastes.

157.  Upon information and belief, for many years Union Machine discharged process wastewater and other wastewaters containing PFAS and other hazardous substances to either on-site disposal systems, leaching structures, or the municipal sewer system leading to a publicly owned treatment works ("POTW"). Union Machine also stored and handled PFAS-containing materials and generated hazardous wastes on-site, with the attendant risk of spills, leaks, and releases to soil and groundwater in the Zone II recharge area.

158.  Municipal wastewater treatment plants are not designed to remove PFAS. PFAS in industrial discharges that enter a POTW are conveyed through the plant and discharged in treated effluent to receiving waters such as the Merrimack River, and are concentrated in sewage sludges and biosolids applied to land (such as the Haverhill Landfill). PFAS released to soils in the Zone II area readily infiltrate through the permeable overburden into the underlying aquifer.

159.  PFAS originating from Union Machine's waste streams can reach Groveland's wells through at least two independent pathways: (i) Direct groundwater migration from the vicinity of Union Machine's facility through the permeable sand-and-gravel aquifer toward the municipal well capture zones within Zone II; and (ii) Discharge of PFAS-containing wastewaters

from Union Machine to the sewer system, transport to a POTW, discharge of PFAS in treated effluent to the Merrimack River or connected surface water, and subsequent induced infiltration of PFAS-contaminated surface water into the aquifer supplying Groveland's wells.

160. As a result of one or more of these pathways, PFAS from Union Machine's operations have been released into the environment and have migrated, and continue to migrate, into the groundwater and surface-water resources that supply Groveland's public water system.

161. PFAS and related hazardous substances used and released by Union Machine are "hazardous substances" and, in some cases, "pollutants" or "contaminants" under CERCLA, and other applicable federal and state environmental laws.

162. Union Machine is a "person" and "facility owner and operator" within the meaning of CERCLA, 42 U.S.C. §§ 9601(21), 9601(9), that has owned and operated a "facility" at which hazardous substances have been "disposed of" and "released" within the meaning of 42 U.S.C. §§ 9601(14), 9601(22).

163. The presence of PFAS and other hazardous substances in Groveland's groundwater, wells, and distribution system constitutes "releases" or "threatened releases" of hazardous substances from one or more "facilities," including but not limited to Union Machine's facility and the sewer and treatment infrastructure to which it is connected.

164. As a direct and proximate result of the releases and threatened releases of PFAS and other hazardous substances associated with Union Machine's operations, Groveland has incurred "response costs," including, without limitation, investigation, monitoring, and treatment-system costs, within the meaning of CERCLA, 42 U.S.C. § 9607(a)(4), and will continue to incur such response costs in the future. These response costs are necessary, consistent with the National Contingency Plan, and were incurred and will be incurred to address the release or

42

threatened release of hazardous substances into the environment and to protect public health and the environment.

165.    Union Machine knew or should have known, based on its status as an experienced aerospace manufacturer and hazardous-waste generator operating within a mapped drinking-water recharge area, that its handling, use, storage, and disposal of PFAS-containing materials, and its discharges of PFAS-containing wastewaters and wastes, created a substantial risk of contaminating groundwater and drinking-water resources.

166.    Nevertheless, Union Machine failed to exercise reasonable care in the selection, handling, storage, use, and disposal of PFAS-containing materials and failed to implement adequate measures to prevent, mitigate, or remediate releases of PFAS into the environment, including into the aquifer and sewer system feeding Groveland's water supplies.

167.    Union Machine's acts and omissions in connection with its use and release of PFAS-containing materials in a highly vulnerable Zone II recharge area constitute negligence, gross negligence, and unreasonable conduct that has caused and will continue to cause contamination of Groveland's drinking-water resources and substantial harm to Groveland and its residents.

168.    Union Machine's actions also constitute a private and public nuisance and trespass in that PFAS from its operations have invaded, and continue to invade, Groveland's property and water-supply infrastructure, interfering with Groveland's rights to use and enjoy its property and to supply clean drinking water to its citizens.

169.    The contamination of Groveland's water resources with PFAS is indivisible and cumulative, and arises from multiple sources within the Zone II area, including Union Machine and other industrial facilities; Union Machine's releases are a substantial contributing factor to the

PFAS contamination of Groveland's water supply and to the response costs and damages Groveland has incurred.

170.    Groveland seeks recovery of all past and future response costs under CERCLA and applicable state analogs, as well as compensatory and other damages under common-law theories including negligence, gross negligence, nuisance, and trespass, and such other relief as the Court deems just and proper.

**FIRST CAUSE OF ACTION**
**Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)**

171.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

172.    Under CERCLA, 42 U.S.C. §§ 9601, *et seq.*, owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation.  42 U.S.C. § 9607(a).

173.    Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

174.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

175.    Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

176.    Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

177. PFOA is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

178. PFOS is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

179. There have been "releases", and/or continue to be releases, and/or disposal of hazardous substances and other PFAS from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Upon information and belief, these releases or threatened releases are ongoing.

180. The hazardous substances and PFAS released from Defendants' facilities were, and are being, released within the source water protection area for Plaintiff's Water Source and migrated to Plaintiff's Water Source.

181. Plaintiff has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances and PFAS from Defendants' facilities.

182. Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply.

183.    By reason of the foregoing, Defendants are liable, jointly and severally, for Plaintiff's necessary response costs, and damages regarding PFAS contamination to Plaintiff's public water supply.

**SECOND CAUSE OF ACTION**
**Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA**

184.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

185.    CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

186.    By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in Plaintiff's public drinking water supply as referenced herein.

187.    A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

188.    A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

189.    Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Plaintiff's public drinking water supply.

190.    Plaintiff will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances and PFAS.

191.    Plaintiff's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

192.    Plaintiff is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

### THIRD CAUSE OF ACTION
### Continuing Public Nuisance

193.    Groveland incorporates by reference the preceding paragraphs as though fully set forth herein.

194.    Groveland, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

195.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

196.    Groveland supplied a clean, safe, portable source of water until it was discovered that PFAS contamination had migrated to Groveland's water supply.

197.    Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are located within the source water protection area for Groveland's Water Source, and PFAS released from them migrated into Groveland's Water Source.

198. Defendants released PFAS through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

199. By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Groveland's special status and authority regarding its natural resources; (iii) Groveland's ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people and its citizens to enjoy their natural resources from interference by pollution and contamination.

200. Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

201. The public nuisance caused by the presence of PFAS in Groveland's drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

202. The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Groveland, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

203. Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS into natural resources and Groveland's Water Source would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Groveland and the public.

204.   As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Groveland has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Groveland can provide its residents and consumers with clean and healthy water.

205.   The interference with Groveland's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

206.   As a direct result of the foregoing, Groveland seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
### Continuing Trespass

207.   Groveland incorporates by reference the preceding paragraphs as though fully set forth herein.

208.   Groveland is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Groveland's Water Source and delivering drinking water to the residents and users of it.

209.   Defendants intentionally engaged in the actions that caused the release of PFAS from their facilities.

210.   Upon information and belief, Defendants knew, or should have known, that PFAS contamination migrated through groundwater and surface water contaminating Groveland's real property used for collecting, treating, and delivering drinking water and the drinking water itself.

211.   Defendants did not and do not have authority, privilege, or permission to trespass upon Groveland's property interests.

212.   The acts and omissions of Defendants caused the PFAS contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, the Nashua River and its tributaries,

49

and groundwater, contaminating Groveland's real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Groveland's right to the full use and enjoyment of its water system for treatment and distribution to residents and businesses. These acts and omissions created a trespass on Groveland's property and unlawful interference with Groveland's property rights.

213.    As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Groveland's property, in the form of the ongoing PFAS contamination of Groveland's water system, Groveland has incurred substantial damages and will incur additional damages to remove PFAS from the public water supply in order to provide their residents and customers with clean and healthy water.

214.    As a direct result of the foregoing, Groveland seeks compensatory damages in a sum to be determined at the time of trial.

## FIFTH CAUSE OF ACTION
### Negligence

215.    Groveland incorporates by reference the preceding paragraphs as though fully set forth herein.

216.    Defendants knew or should have known that PFAS and PFAS-containing products and materials, and other toxic chemicals, create a substantial risk of harm to groundwater and to members of the public who consume such groundwater.

217.    Defendants knew or should have known that the chemicals containing PFAS and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, surface waters, groundwater, the aquifer and therefore, Groveland's Water Source.

50

218.    Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters, soil, groundwater, and/or the aquifer, and/or said Defendants own or owned the properties upon which such actions and/or results occurred.

219.    Defendants owed Groveland a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS and other toxic chemicals into the soil, surface waters, and groundwater at their properties.

220.    Defendants owed Groveland a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and other toxic chemicals into the hydrological features and into Groveland's Water Source.

221.    Defendants owed Groveland a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS from their facilities and/or properties.

222.    Upon learning of a release of solvents and compounds, including but not limited to PFAS containing products, PFAS, and other toxic chemicals, at their facilities and/or properties, Defendants owed Groveland a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Groveland's Water Source.

223.    Defendants breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

224. Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS and other toxic chemicals after they occurred.

225. Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from their properties into Groveland's Water Source.

226. As a result of Defendants' breaches of their duties, Groveland has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

227. Defendants' respective breach of their duties was the direct, sole and proximate cause of Groveland's damages.

228. As a direct result of the foregoing, Groveland seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing claims, Plaintiff request that the Court grants the following relief:

A. Find the Defendants liable for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances and PFAS that have contaminated Plaintiff's public drinking water supply, and order Defendants to reimburse the Plaintiff for its past, present, and future costs to investigate, monitor, evaluate, and remediate the PFAS that continues to migrate into Plaintiff's public water supply, including the costs of employing outside consultants and testing labs for these tasks.

52

B.     Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS contamination in the Village of Nyack's public drinking water supply.

C.     Award Plaintiff monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS contamination of the Plaintiff's public water supply.

D.     Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Plaintiff to remove PFAS from the public water supply.

E.     Award Plaintiff its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these claims.

F.     Award Plaintiff such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims for which a jury trial is available.

Dated: March 16, 2026                              Respectfully submitted,

 */s/ Harold P. Naughton, Jr.*
Harold P. Naughton, Jr., Esq., Judge (ret.)
**NAPOLI SHKOLNIK PLLC**
PO Box 128
Clinton, MA 01510-0128
Tel. (212) 397-1000
HNaughton@napolilaw.com

James L. Simpson, Esq.
    *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York, NY  10017-6502
Tel. (212) 397-1000
JSimpson@napolilaw.com

Paul J. Napoli, Esq.
    *(Pro Hac Vice Forthcoming)*
Jose Tormos, Esq.
    *(Pro Hac Vice Forthcoming)*
Marisa C. Font-Robert, Esq.
    *(Admission Application Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR  00907-3982
Tel. (833) 271-4502
PNapoli@nsprlaw.com
JTormos@nsprlaw.com
MFont@nsprlaw.com

***Counsel for Plaintiff***